MKM:PAS
F. # 2018R02240

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

IN THE MATTER OF THE SEARCH OF

(1) ONE BLACK MOTOROLA
CELLULAR TELEPHONE (TYPE:
M373B),

(2) ONE BLACK LG CELLULAR
TELEPHONE, AND

(3) ONE BLACK TOMTOM GPS DEVICE
(TYPE: 4EQ41 Z1230, SN:
AW2482H04395),

CURRENTLY LOCATED IN THE
CUSTODY OF THE BUREAU OF
ALCOHOL, TOBACCO, FIREARMS
AND EXPLOSIVES.

**FILED UNDER SEAL**

APPLICATION FOR A SEARCH
WARRANT FOR ELECTRONIC
DEVICES

Case No. 18-M-1188

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Tyler Miceli, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.    I make this affidavit in support of an application under Rule 41 of the Federal

Rules of Criminal Procedure for a search warrant authorizing the examination of property—

electronic devices further described in attachment A—which are currently in law

enforcement possession in the Eastern District of New York, and the extraction from that

property of electronically stored information described in Attachment B.

2.      I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and
Explosives ("ATF"), and have been for approximately two and a half years.  I have extensive
experience in conducting robbery and fugitive investigations.  As a result of my training and
experience, I am familiar with the practice of searching for and obtaining electronic evidence
to help identify, locate and prosecute defendants.  I have participated in dozens of
investigations involving search warrants, including warrants for the search of electronic
devices.  As a result of my training and experience, I am familiar with the techniques and
methods of operation used by individuals involved in criminal activity to conceal their
activities from detection by law enforcement authorities.

3.      This affidavit is intended to show only that there is sufficient probable cause
for the requested warrant and does not set forth all of my knowledge about this matter.  The
facts in this affidavit come from my personal observations, my training and experience and
information obtained from other law enforcement agents and officers and from public
records databases.  The statements described in this affidavit are set forth in sum, substance,
and in part.

4.      Based on the facts set forth in this affidavit, there is probable cause to believe
that the information described in Attachment A contains evidence and instrumentalities of
violations of Title 18, United States Code, Sections 1951, 924(c)(1)(A)(i), 924(c)(1)(A)(ii)
and 924(c)(1)(A)(iii).

**IDENTIFICATION OF THE DEVICES TO BE EXAMINED**

5.      The property to be searched includes: (1) ONE BLACK MOTOROLA
CELLULAR TELEPHONE (TYPE: M373B) (hereinafter "Device 1"), (2) ONE BLACK LG

2

CELLULAR TELEPHONE (hereinafter "Device 2") and (3) ONE BLACK TOMTOM GPS DEVICE (TYPE: 4EQ41 Z1230, SN: AW2482H04395) (hereinafter ("Device 3") and collectively the "Devices"). Photographs of the devices are included in Attachment A. The Devices are currently located in the custody of the ATF within the Eastern District of New York.

6. The applied-for warrant would authorize the forensic examination of the Devices for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

7. On November 27, 2018, in the Eastern District of New York defendant SCOTT BRACK (hereinafter "defendant SCOTT BRACK") and defendant ELGIN BRACK (hereinafter "defendant ELGIN BRACK") were charged via a criminal complaint with four counts of Hobbs Act robbery in violation of Title 18, United States Code, Sections 1951 and 2 (18-MJ-1124 (SMG)). Defendant ELGIN BRACK was also charged with one count of brandishing a firearm in furtherance of a crime of violence, in violation of Title 18, United States Code, Section 924(c)(1)(A)(ii) and one count of discharging a firearm in furtherance of a crime of violence, in violation of Title 18, United States Code, Section 924(c)(1)(A)(iii) (18-MJ-1124 (SMG)). There is probable cause to search the Devices described in Attachment A for evidence and instrumentalities of these crimes further described in Attachment B.

<u>The Armed Robbery of a Duane Reade Store</u>
<u>Located at 60-02 Roosevelt, Avenue, Queens, New York</u>

8.      On or about November 26, 2018 at approximately 3:36 a.m., an African American man, later identified as defendant ELGIN BRACK, entered a Duane Reade store located at 60-02 Roosevelt, Avenue, Queens, New York.

9.      Upon entering the store, defendant ELGIN BRACK approached a cash register and attempted to purchase an item.  At the time he approached the Duane Reade store register, the store's video surveillance captured defendant ELGIN BRACK wearing dark colored pants with multiple horizontal copper zippers and multiple holes on the front of the pants' legs, a dark colored hoodie with a green hood, green upper torso covering his shoulder area and red writing on the back of the hoodie, black gloves with white writing on the top of the gloves and white sneakers.  Defendant ELGIN BRACK's face was not covered.

10.     In response to defendant ELGIN BRACK approaching the cash register, a Duane Reade employee, Victim 1 (hereinafter "Victim 1"), opened the store's cash register. Defendant ELGIN BRACK then approached the cash register from behind a store counter and an exchange occurred between Victim 1 and defendant ELGIN BRACK.  Video footage further captured defendant ELGIN BRACK fire one shot from a black colored firearm at Victim 1.  The shot fired by defendant ELGIN BRACK stuck Victim 1 in his left hand.  A struggle between Victim 1 and defendant ELGIN BRACK ensued and defendant ELGIN BRACK eventually fled the Duane Reade store.  After the shooting, an unrelated patron of the Duane Reade found Victim 1 and called 911.  Upon arrival, NYPD officers determined

4

that Victim 1 was suffering from two gunshot wounds - one gunshot wound to Victim 1's left hand and one gunshot wound to Victim 1's head.

### The Armed Robbery of a 7-Eleven
### located at 50-92 Northern Boulevard, Queens, New York

11.     On or about November 26, 2018 at approximately 3:58 a.m., an African American man, later identified as defendant ELGIN BRACK, entered a 7-Eleven store located at 50-92 Northern Boulevard, Queens, New York. The 7-Eleven store located at 50-92 Northern Boulevard in Queens, New York is approximately .7 miles from the Duane Reade store located 60-02 Roosevelt, Avenue, Queens, New York.

12.     Upon entering the 7-Eleven store, defendant ELGIN BRACK walked throughout the store and then exited the store. Shortly after exiting the 7-Eleven store, defendant ELGIN BRACK reentered the 7-Eleven store. Throughout defendant ELGIN BRACK's two separate periods inside the 7-Eleven store, video surveillance captured defendant ELGIN BRACK wearing dark colored pants with multiple horizontal copper zippers and multiple holes on the front of the pants' legs, a dark colored hoodie with a green hood, green upper torso covering his shoulder area and red writing on the back of the hoodie, black gloves with white writing on the top of the gloves and white sneakers.

13.     After entering the 7-Eleven store for the second time, defendant ELGIN BRACK approached a 7-Eleven store employee (hereinafter "Victim 2") who was working at the store's cash register. Defendant ELGIN BRACK then indicated that he wished to purchase two pieces of candy. In response, Victim 2 opened the store's cash register, at which time defendant ELGIN BRACK displayed a black firearm and demanded all of the

5

money in the register. In response, Victim 2 handed defendant ELGIN BRACK the 7-Eleven store's register's cash tray that contained approximately $300. Defendant ELGIN BRACK then took the register's tray, along with the approximately $300, and exited the 7-Eleven store. Victim 2 called 911 and reported the armed robbery of the 7-Eleven store located 50-92 Northern Boulevard, Queens, New York.

The Armed Robbery of a Rite Aid Store
located at 33-01 30th Avenue, Queens New York

14.     On or about November 26, 2018 at approximately 4:20 a.m., an African American man, later identified as defendant ELGIN BRACK, entered a Rite Aid store located at 33-01 30th Avenue, Queens, New York. The Rite Aid store located at 33-01 30th Avenue, Queens, New York is approximately 1.5 miles from the 7-Eleven store located at 50-92 Northern Boulevard in Queens, New York.

15.     According to an employee in the store (hereinafter "Victim 3"), defendant ELGIN BRACK approached the register and indicated that he wished to make a purchase of a pack of gum. Based on video surveillance, defendant ELGIN BRACK was wearing dark colored pants with multiple horizontal copper zippers and multiple holes on the front of the pants' legs, a dark colored hoodie with a green hood, green upper torso covering his shoulder area and red writing on the back of the hoodie, black gloves with white writing on the top of the gloves and white sneakers.

16.     In response to defendant ELGIN BRACK indicating that he wished to make a purchase of a pack of gum, Victim 3 opened the Rite Aid store's cash register, at which time defendant ELGIN BRACK displayed a black firearm. Defendant ELGIN BRACK then told

6

Victim 3 to give him all of the money in the Rite Aid's cash register. Victim 3 handed

defendant ELGIN BRACK the cash register tray containing approximately $802. After

taking the cash register tray containing approximately $802, defendant ELGIN BRACK

exited the store. Victim 3 called 911 and reported an armed robbery of the Rite Aid store

located at 33-01 30th Avenue, Queens, New York.

17.     In addition, during the armed robbery of the Rite Aid store located at 33-01

30th Avenue, Queens, New York, video surveillance outside of this Rite Aid store captured a

silver two-door Toyota Solara. During that video, the driver of the silver two-door Toyota

Solara, later identified as defendant SCOTT BRACK, exited the silver two-door Toyota

Solara and discarded an item consistent in size and shape with the 7-Eleven cash register tray

taken from the 7-Eleven located at 50-92 Northern Boulevard, Queens, New York. The

surveillance video also captured defendant SCOTT BRACK wearing gray colored pants, a

gray colored hoodie, a dark colored jacket, white shoes and a black hat.

The Armed Robbery of a Rite Aid Store
located at 115-10 Merrick Boulevard, Queens New York

18.     On or about November 26, 2018 at approximately 5:45 a.m., an African

American man, later identified as the defendant ELGIN BRACK, walked near a two-door

Silver Toyota Solara and then entered a Rite Aid store located at 115-10 Merrick Boulevard,

Queens, New York. The Rite Aid store located at 115-10 Merrick Boulevard, Queens, New

York is located approximately 11.7 miles from the Rite Aid store located at 33-01 30th

Avenue, Queens, New York.

7

19.     According to an employee in the Merrick Boulevard Rite Aid store (hereinafter "Victim 4"), defendant ELGIN BRACK approached the cash register and indicated that he wished to make a purchase of a Snickers candy bar. Based on video surveillance from the Merrick Boulevard Rite Aid store, defendant ELGIN BRACK was wearing dark colored pants with multiple horizontal copper zippers and multiple holes on the front of the pants' legs, a dark colored hoodie with a green hood, green upper torso covering his shoulder area and red writing on the back of the hoodie, black gloves with white writing on the top of the gloves and white sneakers.

20.     In response to defendant ELGIN BRACK indicating that he wished to purchase the Snickers candy bar, Victim 4 opened the store's cash register, at which time defendant ELGIN BRACK displayed a black firearm and told Victim 4 to give him all of the money in the Rite Aid's cash register or defendant ELGIN BRACK would shoot Victim 4. Victim 4 then handed defendant ELGIN BRACK the cash register tray containing approximately $200. After taking the cash register tray containing approximately $200, defendant ELGIN BRACK exited the store and fled in a two-door Silver Toyota Solara. Victim 4 called 911 and reported an armed robbery of the Rite Aid store located at 115-10 Merrick Boulevard, Queens, New York.

21.     License plate reader data available to NYPD indicates that on November 26, 2018, at 3:42 a.m., approximately six minutes after the above-described first robbery, that a two-door Silver Toyota Solara was located on Roosevelt Avenue and 58th Street in Queens, New York, which is .01 miles from the location of the first robbery at the Duane Reade store.

8

22.     On November 26, 2018, at 6:45 p.m., law enforcement officers discovered a two-door Silver Toyota Solara, with the same license plate number from the earlier 3:42 a.m. NYPD license plate reader data, in the area of 2008 Hughes Avenue, Bronx, New York. Additional investigation has revealed that defendant SCOTT BRACK lives 2031 Hughes Avenue, Bronx, New York, which is approximately 300 feet from 2008 Hughes Avenue, Bronx, New York.

23.     In response to a potential match of the car used in the four armed robberies law enforcement officers went to the area of 2008 Hughes Avenue, Bronx, New York. After arriving in that area, agents observed a two-door Silver Toyota Solara that was occupied by three African American men and one child. Two of the car's occupants were later identified as defendant SCOTT BRACK and defendant ELGIN BRACK. Law enforcement officers approached the two-door Silver Toyota Solara and during their approach saw affixed to the car's front windshield the black TomTom GPS Device (Type: 4EQ41 Z1230, SN: AW2482H04395) (Device 3). Device 3 was illuminated, indicating that it was in-use.

24.     The responding officers then informed the two-door Silver Toyota Solara's occupants, including defendant SCOTT BRACK and defendant ELGIN BRACK, that the car they were in was the subject of interest in a series of armed robberies. Defendant SCOTT BRACK and defendant ELGIN BRACK and the other adult occupant of the two-door Silver Toyota Solara were then placed in handcuffs.

25.     Found inside the two-door Silver Toyota Solara, immediately beneath defendant ELGIN BRACK's person, was a dark colored hoodie with a green hood, green upper torso covering the shoulder area and red writing on the back of the hoodie, which

9

based upon a review of the surveillance footage from the four robberies was consistent with the clothing worn at each incident. Defendant ELGIN BRACK was wearing white sneakers that were consistent with the shoes worn during each armed robbery. Also found beneath defendant ELGIN BRACK was the Black LG cellular telephone (Device 2). In addition, in the same car were found dark colored pants with multiple horizontal copper zippers and multiple holes on the front of the pants' legs, which were consistent with those worn in each of the four armed robberies by defendant ELGIN BRACK.

26.     Within an arm's length distance of where defendant ELGIN BRACK was originally seated in the two-door Silver Toyota Solara was a backpack that contained a wallet with a piece of photo identification for defendant ELGIN BRACK, as well as a black firearm - a .357 caliber Dan Wesson Arms revolver. The recovered firearm contained two spent ammunition casings consistent with the number of rounds of ammunition that were fired during the first robbery at the Duane Reade store.

27.     At the time of the stop, defendant SCOTT BRACK was wearing a gray hoodie and black jacket consistent with the hoodie and jacket that were worn by the driver of the two-door Silver Toyota Solara outside of the third armed robbery at the Rite Aid at 33-10 30th Avenue, Queens, New York.

28.     Responding officers also viewed the illuminated screen of Device 3, the TomTom GPS device. The screen included five recent addresses. Included in these recent addresses were: (1) 2008 Hughes Ave, Bronx New York, which is approximately 300 feet from defendant SCOTT BRACK's residence and (5) 3109 31st Ave, Woodside New York

10

which is approximately .02 miles from the Rite Aid store located at 33-01 30th Avenue, Queens New York.

29.     Upon his arrest, defendant SCOTT BRACK was read his <u>Miranda</u> rights, which he waived, agreeing to speak without an attorney present. Defendant SCOTT BRACK admitted to driving defendant ELGIN BRACK to the armed robbery at Duane Reade located at 6002 Roosevelt Avenue, Queens, New York, the armed robbery at the 7-Eleven located at 5092 Northern Boulevard, Queens, New York and the armed robbery at the Rite Aid located at 115-10 Merrick Boulevard, Queens, New York. Defendant SCOTT BRACK also admitted to receiving $400 from defendant ELGIN BRACK following the robberies.

30.     Additionally, while processing the defendant SCOTT BRACK, he was found to have in his possession approximately $383 and the Black Motorola cellular telephone (Type: M373B) (Device 1). Defendant ELGIN BRACK had in his possession approximately $6,148.

31.     Based on my training and experience, I am aware that individuals engaged in armed robberies often use their cellular telephones during the planning, execution and flight phases of robberies to communicate through text applications and by telephone with their other co-conspirators, and that this and other evidence (including photographs) of the association of co-conspirators is often stored on the cellular telephones. In addition, cellular telephones, as well as GPS devices, store information as to the whereabouts at certain times and the travel routes of their users.

11

32.    The Devices are currently in the lawful custody and storage of the ATF special agents who seized the three Devices incident to the arrests of defendant SCOTT BRACK and defendant ELGIN BRACK.  In my training and experience, I know that the Devices have been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when the Devices first came into the possession of the special agents of the ATF.

## TECHNICAL TERMS

33.    Based on my training and experience, I use the following technical terms to convey the following meanings:

a.  Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading

information from the Internet. Wireless telephones may also include global

positioning system ("GPS") technology for determining the location of the

device.

b.  Digital camera: A digital camera is a camera that records pictures as digital

picture files, rather than by using photographic film. Digital cameras use a

variety of fixed and removable storage media to store their recorded images.

Images can usually be retrieved by connecting the camera to a computer or by

connecting the removable storage medium to a separate reader. Removable

storage media include various types of flash memory cards or miniature hard

drives. Most digital cameras also include a screen for viewing the stored

images. This storage media can contain any digital data, including data

unrelated to photographs or videos.

c.  PDA: A personal digital assistant, or PDA, is a handheld electronic device used

for storing data (such as names, addresses, appointments or notes) and utilizing

computer programs. Some PDAs also function as wireless communication

devices and are used to access the Internet and send and receive e-mail. PDAs

usually include a memory card or other removable storage media for storing data

and a keyboard and/or touch screen for entering data. Removable storage media

include various types of flash memory cards or miniature hard drives. This

removable storage media can store any digital data. Most PDAs run computer

software, giving them many of the same capabilities as personal computers. For

example, PDA users can work with word-processing documents, spreadsheets,

13

and presentations.  PDAs may also include GPS technology for determining the location of the devices.

d.  GPS: A GPS navigation device, including a TomTom GPS device such as Device 3, uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The GPS consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.  IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (*e.g.*, 121.56.97.178).  Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most

14

Internet service providers control a range of IP addresses.  Some computers

have static—that is, long-term—IP addresses, while other computers have

dynamic—that is, frequently changed—IP addresses.

f.   Internet: The Internet is a global network of computers and other electronic

devices that communicate with each other.  Due to the structure of the Internet,

connections between devices on the Internet often cross state and international

borders, even when the devices communicating with each other are in the

same state.

34.     Based on my training, experience, and research, I know that the Devices have

capabilities that allow them to serve as a wireless telephone, digital camera, PDA and GPS

navigation device.  In my training and experience, examining data stored on devices of this

type can uncover, among other things, evidence that reveals or suggests who possessed or

used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

35.     Based on my knowledge, training, and experience, I know that electronic

devices such as the Devices can store information for long periods of time.  Similarly, things

that have been viewed via the Internet are typically stored for some period of time on the

devices.  This information can sometimes be recovered with forensics tools.

36.     Forensic evidence:  As further described in Attachment B, this application

seeks permission to locate not only electronically stored information that might serve as

direct evidence of the crimes described on the warrant, but also forensic evidence that

establishes how the Devices were used, the purpose of their use, who used them, and when.

There is probable cause to believe that this forensic electronic evidence may be on the Devices because:

    a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

    b.  Forensic evidence on devices can also indicate who has used or controlled the devices. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c.  A person with appropriate familiarity with how electronic devices work may, after examining this forensic evidence in its proper context, be able to draw conclusions about how the electronic devices were used, the purpose of their use, who used them, and when.

    d.  The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how devices were used, the purpose of their use, who used them, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

37.  Nature of examination:  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Devices consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire mediums, that may expose many parts of the devices to human inspection to determine whether it is evidence described by the warrant.

38.  Manner of execution:  Because this warrant seeks only permission to examine a devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

39.  I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Devices described in Attachment A to seek the items described in Attachment B.

## REQUEST FOR SEALING

40.     It is respectfully requested that this Court issue an order sealing, until further

order of the Court, all papers submitted in support of this application, including the

application and search warrant.  I believe that sealing this document is necessary because the

warrant is relevant to an ongoing investigation into the potential source of the firearm and

ammunition in question, and it reveals information about cooperating victims.  Based upon

my training and experience, I have learned that, online criminals actively search for criminal

affidavits and search warrants via the internet, and disseminate them to other online criminals

as they deem appropriate, *i.e.*, post them publicly online through the carding forums.

Premature disclosure of the contents of this affidavit and related documents may have a

significant and negative impact on the continuing investigation and may severely jeopardize

its effectiveness.


Respectfully submitted,


Tyler Miceli
Special Agent
Bureau of Alcohol, Tobacco, Firearms and
Explosives


Subscribed and sworn to before me
on December 10, 2018:


THE HONORABLE STEVEN L. TISCIONE
UNITED STATES MAGISTRATE JUDGE


18

## **ATTACHMENT A**

The property to be searched includes: (1) ONE BLACK MOTOROLA CELLULAR TELEPHONE (TYPE: M373B) ("Device 1"), (2) ONE BLACK LG CELLULAR TELEPHONE ("Device 2") and (3) ONE BLACK TOMTOM GPS DEVICE (TYPE: 4EQ41 Z1230, SN: AW2482H04395) ("Device 3"), collectively the "Devices." The Devices are currently located in the custody of the Bureau of Alcohol, Tobacco, Firearms and Explosives within the Eastern District of New York. Photographs of the Devices are on the following page.

This warrant authorizes the forensic examination of the Devices for the purpose of identifying the electronically stored information described in Attachment B.

Device 1: <u>BLACK MOTOROLA CELLULAR TELEPHONE (TYPE: M373B)</u>



Device 2: <u>BLACK LG CELLULAR TELEPHONE</u>

 

## Device 3: BLACK TOMTOM GPS DEVICE (TYPE: 4EQ41 Z1230, SN: AW2482H04395)

 



## ATTACHMENT B

1.      All records on the Devices described in Attachment A that relate to the
violations of Title 18, United States Code, Sections 1951, 924(c)(1)(A)(i), 924(c)(1)(A)(ii)
and 924(c)(1)(A)(iii) and involve defendant SCOTT BRACK and defendant ELGIN BRACK
since November 1, 2018, including:

     a.   names and telephone numbers, as well as the contents of all call logs, contact
lists, text messages, e-mails (including those sent, received, deleted and
drafted), instant messages, photographs, videos, Facebook posts and messages,
Internet activity (including browser history, web page logs, and search terms
entered by the user), geo-location data, application data, and other electronic
media;

     b.   records related to acquisition, sale, or possession of firearms and ammunition
(including names, addresses, phone numbers, or any other identifying
information), and evidence of potential threats or violence against or on behalf
of the owner of the Devices; and

     c.   all bank records, checks, credit card bills, account information, and other
financial records.

2.      Evidence of user attribution showing who used or owned the Devices at the
time the things described in this warrant were created, edited, or deleted, such as logs,
phonebooks, saved usernames and passwords, documents, and browsing history;

3.      Records evidencing the use of the Internet Protocol address to communicate
with firearms and ammunition suppliers, and/or unindicted co-conspirators, including:

a.  records of Internet Protocol addresses used;

b.  records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

4.      Records evidencing the use of the GPS device to determine travel destinations and routes.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.